IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES,                      :     CRIMINAL ACTION
                                    :     NO. 06-367
                                    :
          v.                        :
                                    :
GREGORY JONES                       :
                                    :
                                    :


M E M O R A N D U M
_____

EDUARDO C. ROBRENO, J.                              MAY 29, 2008

          Gregory Jones ("Jones") was charged in a nine-count
superceding indictment with an array of crimes stemming from the
theft and unlawful reproduction of credit card numbers.  The
defendant pled guilty to conspiracy, credit card fraud, identity
fraud and aggravated identity fraud in violation of 18 U.S.C. §§
371, 1029(a)(3), 1029(a)(4), 1028(a)(5), 1028(a)(1), and 2.
Before the Court are defendant's objections to the Pre-Sentence
Report ("PSR") dated October 1, 2007.


I.   BACKGROUND

          At the plea hearing on March 16, 2007, Jones indicated
that while he was admitting his guilt to the underlying offenses,
he objected to certain facts claimed in the PSR that would give
rise to enhancements under the Sentencing Guidelines
("guidelines") at the time of sentencing.  Hr'g Tr. 22:2-25:4,

-1-

Mar. 15, 2007.  Specifically, the defendant objected to the number of accounts, or access devices, which were claimed in the PSR.  The Court proceeded with the change of plea hearing with the caveat that the specific number of accounts attributable to the defendant would be determined at sentencing.  On June 18, 2007, defendant's attorney, Gregory Noonan, Esquire, orally moved to withdraw from the case, citing ongoing conflict between himself and the defendant.  The Court granted this motion, assigned Jerry S. Goldman, Esquire, as new counsel,[1] and without objection re-set the sentencing for November 30, 2007.  During a telephone conference on November 26, 2007, counsel for both parties indicated to the Court that they planned on submitting evidence and eliciting testimony in support of and to rebut the objections to the PSR.

In connection with the objections to the PSR, the Court held two evidentiary hearings, one on November 29, 2007, and one on December 11, 2007.  At these hearings, the government called the Secret Service agent in charge of the investigation, Agent McDowell, and two cooperating witnesses.  Jones was the only witness to testify on his behalf.  Following the submission of exhibits, the Court ordered both parties to submit new sentencing memoranda, as well as proposed findings of fact and conclusions

---

[1] Mr. Goldman's entry into this case marked a heightened level of written and oral advocacy on behalf of the defendant.

of law.  On March 25, 2008, the Court heard oral argument.

Reduced to its essence, five sentencing issues have evolved and are now before the Court: (1) the amount of loss attributable to the defendant; (2) whether a sophisticated means enhancement should be applied to the sentence pursuant to U.S.S.G. § 2B1.1(9)(C); (3) the correct criminal history score of the defendant; (4) whether an obstruction of justice enhancement should be applied to the sentence pursuant to U.S.S.G. § 3C1.1; and (5) whether the defendant should be entitled to a two or three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  These issues are now ripe for decision.


II.  FINDINGS OF FACT

The facts in this case are largely undisputed.  At all relevant times, Jones and another individual named Brian "Judge" Morgan ("Morgan") were friends and business acquaintances.  Hr'g Tr. 173:5-20, Nov. 29, 2007.  In 2002, the two men met with a third man, Dan Mitchell, who instructed them on the "theory" and necessary materials for making counterfeit credit cards.  Id. at 175:12-13.

In 2002, the three men began operating a counterfeiting plant out of an apartment located at 39th and Girard Streets in Philadelphia, Pennsylvania.  The plant remained in operation until the equipment was stolen at some point in 2003.  Id. at

-3-

176:16-25.  Sometime later in 2003, Morgan and Jones leased an
apartment at 57th and Rodman Streets, also in Philadelphia,
Pennsylvania.  From that location, and from 2003 to 2006,[2] the
defendant and Morgan engaged in the theft, production,
counterfeiting and distribution of credit cards and credit card
numbers.

Morgan contributed most of the money with which he and
Jones purchased the equipment necessary for the production of the
counterfeit credit cards.  Id. at 180:6-12.  Jones, on the other
hand, was responsible for "loading the software [and] obtaining
information as far as the logos of different things that was
[sic] needed to make the documents look authentic."  Id.  They
shared equally in the cost of maintaining the machinery and
getting new materials, id. at 184:20, and jointly set $100 as the
minimum price for counterfeit credit cards.  Id. at 194:12.  They
also jointly ordered skimmers[3] from the internet.  Id. at 192:1.
Morgan testified that the two were involved in a fifty-fifty
partnership except that they each had their own client lists and

---

[2] At one point, Jones and Morgan were running a plant out of
54th st. in Wynnefield, Pennsylvania.  Hr'g Tr. 179:2-3, Nov. 29.
2007.  This plant is not part of the charged conduct in the case.

[3] Skimmers are devices through which a credit card can be
swiped, retaining the information stored on the card's magnetic
strip.  Id., 57:15-18.

sources of credit card numbers.[4]  Id. at 185:9-17.

        At some point between 2003 and 2005, Jones and Morgan purchased new equipment and moved their illicit enterprise from the Rodman Street location to 1913 Alden Street in Philadelphia, Pennsylvania.  Id. at 180:20.  On February 7, 2007, a search warrant was executed on the Alden Street address and Morgan was arrested.  Hr'g Tr. 37:4, Dec. 11, 2007.  Among those items confiscated from the Alden Street address were thousands of credit card numbers, multiple computers, scanners, an embosser,[5] credit card receipts from numerous businesses, images of credit card holograms, tipping foil,[6] and hundreds of completed counterfeit credit cards and drivers licenses.  Gov't Ex. Alden 1.  In total, there were 6,631 distinct, i.e. non-duplicative, credit card numbers[7] found at 1913 Alden Street.  Mr. Jones admitted that he had been continuously involved in the manufacturing of counterfeit credit cards from the date he and Mr. Morgan purchased the property.  Hr'g Tr. 38:3-8, Dec. 11,

---

    [4] Morgan conceded that on occasion they would share credit card numbers if one of them did not have any at a given moment. Hr'g Tr. 187:11-4, Nov. 29. 2007.

    [5] An embosser is an expensive machine which is used to raise or elevate digits on a credit card.  Id. at 48:15-21.

    [6] Tipping foil is used to paint the embossed digits on a credit card, a silver or gold color.  Id. at 49:1-3.

    [7] The numbers were found on rolls of receipts, on used tipping foil, handwritten on pieces of paper and on actual credit cards.  Hr'g Tr. 76:1-4, Nov. 29, 2007.

2007.

Following Morgan's arrest, and apparently undeterred, Jones continued the illicit business at an apartment located at 4158 Girard Avenue, in Philadelphia, Pennsylvania.  In May of 2006, the Secret Service executed a search warrant at that location and Jones was arrested.  Id. at 40:17.  142 credit card numbers were found at the Girard Avenue address.

The 6,631 credit card numbers found at the Alden Street address, combined with the 142 found at the Girard Ave address, yield a total of 6,773 credit card numbers.  Of these, the government seeks to hold Jones liable for approximately 6,700 distinct credit card numbers.  2,748 of the 6,700 numbers were found on credit card receipts, skimmers and the business records of the Comcast Corporation.  Hr'g Tr. 77:2-79:4, Nov. 29, 2007; Govt. Ex. 3-1.


III. DISCUSSION AND CONCLUSIONS OF LAW

For sentencing purposes, a district court should make its findings applying a preponderance of the evidence standard. United States v. Grier, 475 F.3d 556, 561 (3d Cir. 2007).  The Sentencing Guidelines are no longer mandatory, but one of many factors to be considered by a sentencing court.  United States v. Booker, 543 U.S. 220, 233-34 (2005).  District courts exercise broad discretion in imposing sentences, so long as they begin

with a properly calculated guidelines range, fully consider the broad range of factors set forth in 18 U.S.C. § 3553(a), and all grounds properly advanced by the parties at sentencing.  United States v. Vampire Nation, 451 F.3d 189, 196 (3d Cir. 2006).  The Court will apply these teachings to the five issues raised by the defendant in his objections to the PSR.

A.   Amount of Loss

"Loss Amount is a sentencing fact (a specific offense characteristic), so it must be found by a preponderance of the evidence.  The court need only make a reasonable estimate of the loss."  United States v. Ali, 508 F.3d 136, 145 (3d Cir. 2007). The defendant has pled guilty to a series of crimes relating to his manufacturing and distributing of counterfeit and unauthorized access devices.  Section 1029(e) of Title 18 defines access devices, counterfeit access devices and unauthorized access devices as follows:

> (1) the term "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

> (2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device;

> (3) the term "unauthorized access device" means any access
> device that is lost, stolen, expired, revoked, cancelled, or
> obtained with the intent to defraud.

Thus, the term "access device" is used to define any item which
permits access into commerce and the marketplace; it is the
production, use, and trafficking of counterfeit and unauthorized
devices[8] which is prohibited by the statute and to which the
defendant has pled guilty.  18 U.S.C. § 1029(a)

U.S.S.G. § 2B1.1, the guideline implicated in this
case, provides that the amount of loss in such a case, "includes
any unauthorized charges made with the counterfeit access device
or unauthorized access device and shall not be less than $500 per
access device."  The Probation Office applied 2B1.1 by
multiplying the number of card numbers found at the Alden Street
and Girard Avenue locations (6700) by $500, resulting in a loss
of $3,350,000.  The guidelines call for an 18-point increase in
the offense level when the amount of loss is between $2,500,000
and $7,000,000.  U.S.S.G. § 2B1.1(b).  Under these
circumstances, the base offense level is six, which, added to the
18-point enhancement, results in an offense score of 24.

Jones concurs with the Probation Office's method of

---

[8] "Counterfeit access devices" are devices with inauthentic
information or which are inauthentic themselves, and
"unauthorized access devices" are devices with authentic
information used without authority.  See generally United States
v. Soape, 169 F.3d 257, 264 (5th Cir. 1999).

calculating the amount of loss.  However, he contends that the amount of loss attributed to him is far less because he should only be held responsible for approximately 1000 access devices. He argues that of the 6700 card numbers found at the Alden Street location, not all were access devices under the statute and of those that were in fact access devices, his co-conspirator Morgan, and not he, is liable for the majority of them.  The Court is then tasked with determining (I) whether all of the 6700 card numbers found constitute access devices and of those, (ii) for how many should responsibility be allocated to Jones.

### 1.   What constitutes an access device?

"Congress intended the definition of "access device" to be broad enough to encompass technological changes, and such term should be construed broadly to encompass innovative schemes perpetrated by criminals who use unauthorized information to defraud." United States v. Komolafe, 246 F. App'x 806, 811 (3d Cir. Aug 31, 2007) (non-precedential).  The government does not need to prove that each access device found was successfully used to perpetrate a fraud, but only that each could have been used to do so.  Id.  Jones argues that credit cards with "fictitious" numbers or which are expired, non-encrypted cards, and those cards with missing security codes, do not qualify as access devices under the statute.  The Court will address these

arguments in turn.

### a.   Fictitious or expired numbers

Jones' argument that expired credit cards are not access devices runs contrary to the very text of the statute. The statute expressly includes expired credit cards in the definition of unauthorized access devices.  18 U.S.C. § 1029(e)(3).[9]  Thus, the argument that expired credit cards are removed from the reach of the statute is wholly without merit. United States v. Jacobowitz, 877 F.2d 162, 167 (2d Cir. 1989) (holding that expired credit cards constitute unauthorized access devices).

While it is clear that all expired credit cards come within the scope of the congressional proscription, randomly generated numbers [incorrectly styled as fictitious numbers by the defendant[10]] by themselves, are not "counterfeit access devices."

Randomly generated numbers, when affixed to blank plastic cards, are only cosmetic, no different from the paint applied to create the likeness to real credit cards.  In this situation, it is of no import what the number is, so long as it

----

[9] See part II.A, supra.

[10] The text of the statute defines a "counterfeit access device" as one that is fictitious.  This is different from identifying a randomly generated number as being "fictitious."

contains the correct number of digits (16 presently) and appears in a way intended to persuade potential victims that the card, as a whole, is genuine.  Affixing the number [and the paint and other materials] to a piece of plastic and holding out its authenticity as a credit card is the conduct proscribed by the statute.  Thus, all the credit cards found at either residence with an affixed randomly generated number are fictitious credit cards, or "counterfeit access devices."  The same is true for any number found on used tipping foil; any number on the tipping foil would have necessarily come from an already made credit card.[11]

However, randomly generated numbers, like those found throughout the Alden Street residence, hand written by the defendant on pieces of paper, which are not authentic credit card numbers, and which have no inherent significance in a financial or accounting sense, are not counterfeit access devices as identified in the statute.[12]

In this case, randomly generated numbers affixed to credit cards will be considered counterfeit access devices and

---

[11] In this case, the number of access devices offered by the government was based solely on the number of unique numbers found at the residences, not credit cards, thereby eliminating the danger of double counting for the number on the credit card and the number on the tipping foil.

[12] Under the government's theory of liability, if carried to its logical conclusion, any mathematician or actuary whose day to day employment involves writing down series of numbers could be potentially liable under § 1029(e).

will be used in calculating the amount of the loss.  Randomly
generated numbers, standing alone, will be excluded.

####    b.   Cards with no information

As for credit cards with no information encoded in the
magnetic strip, there was testimony at the hearing from Agent
McDowell that, as a practice, individuals such as the defendant,
will manufacture information-less credit cards to serve as backup
forms of identification.  For example, the government presented
evidence that when applying for a line of credit at a store, the
store will often require a secondary form of identification.
Hr'g Tr. 96:4-24, Nov. 29, 2007.  Under these circumstances, the
counterfeit credit card is used fraudulently even though it has
no information on the magnetic strip.

Moreover, the evidence offered by the government at the
hearing showed that Jones had in fact manufactured a counterfeit
driver's license and credit card with matching name to
successfully obtain a line of credit at a Lowe's hardware store.
Id. at 82-86. Section 1029(e) of Title 18 clearly states that an
access device is one which can be used alone, or in conjunction
with another access device. (Emphasis added).  In the Lowe's
example, the fraud was committed by using a false identification
in conjunction with a counterfeit credit card; conduct clearly
covered by the statute.  See United States v. Elmaroudi  2008

U.S. Dist. LEXIS 19301 (N.D. Iowa, Mar. 12, 2008) (citing to
Komalfe in holding that social security cards could constitute
access devices when used as secondary identification for purposes
of obtaining credit).

Therefore, credit cards without information encoded
into the magnetic strip constitute access devices.

### c.   Missing security codes

Lastly, defendant claims that those cards found with a
missing security code should not constitute access devices.
However, Agent McDowell testified at the hearing that a missing
security code would ordinarily only pose a problem for those
wishing to complete a transaction online or over the phone; the
security code is in place to authenticate a card when the seller
is unable to physically see the card.  Hr'g Tr. 136:15-21, Nov.
29, 2007.  Here, cards without security codes would still be
capable of perpetrating a fraud, and therefore would fall within
the purview of § 1029.

For these reasons, the Court concludes every credit
card found at either residence, every number found on any receipt
or business record, every number downloaded from a skimmer,[13] and
every number, whether authentic or fictitious, gleaned from

---

[13] These numbers necessarily came from authentic cards.  Hr'g
Tr. 77:21-23, Nov. 29, 2007.

tipping foil, constitutes an access device.[14]  While the
government argues that all of the above should be included in the
Court's calculation of the loss, the only itemization of the
numbers offered by the government were those numbers obtained
from the receipts found at the residence, the Comcast accounts,
and those numbers downloaded from the skimmers.  In total, there
were 2,748 card numbers found falling into the above three
categories.[15]  Thus, the Jones' maximum liability is only for
2,748 access devices, which multiplied by $500.00, is $1,374,000.

---

[14] Citing to the text of the statute, defense counsel
contended at the March 25, 2008, hearing that an access device
that could not be used on its own to defraud, could only
constitute an actual counterfeit or unauthorized access device if
it were capable of being used in conjunction with another access
device.  Specifically, with regard to the Lowe's example, because
the fictitious card was being used in conjunction with a drivers
license, and not an access device, the fictitious card was not an
access device.  Hr'g Tr. 25:6-10, Mar. 25, 2008.  This argument
is not persuasive, in part because such a finding would render
the statute unenforceable.  See United States. v. Klopf, 423 F.3d
1228 (11th Cir. 2005) (holding that credit cards used in
conjunction with drivers licenses are to be considered access
devices).  The government astutely carried this argument to its
logical conclusion in that any access device will almost always
necessitate the use of some other legal or legitimate object or
medium to carry out the fraud.  For example, the credit card
number will need to be used in conjunction with a piece of
rectangular plastic or at the very least a telephone or computer
through which to make an online purchase.

[15] The government did not provide the Court with a total of
those numbers found on tipping foil and those numbers found on
credit cards.  Thus, the Court has no way of knowing how many
numbers were found written on paper, and how many were taken from
tipping foil or credit cards.

          2.   Relevant conduct

          Jones also argues that the PSR incorrectly assessed his responsibility for the access devices found at the Alden Street location.[16]  U.S.S.G. § 1B1.3(a)(1)- Relevant Conduct, states that a sentence will be calculated based on:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged in the conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

Under 1B1.3(a)(1), as applied to this case, the Court must determine 1) whether Jones aided, abetted, etc. those criminal actions of Morgan, or 2) whether Morgan's actions were reasonably foreseeable in furtherance of a jointly undertaken activity. While the government focused only on whether there was a joint undertaking in its brief, it argued at the March 25, 2008, hearing that both subsections (A) and (B) could apply the relationship between Jones and Morgan.  The Court concludes that

---

[16] Jones is responsible for all of the access devices found at the Girard Avenue location as Morgan was in prison at the time that location was in operation.

-15-

the evidence is sufficient to impose liability under either theory.

     a.  <u>Joint undertaking</u>

       To establish liability for jointly undertaken activity, the burden is on the government to demonstrate that the acts committed by the defendant, in concert with others (Morgan in this case), were: (1) in furtherance of the jointly undertaken activity; (2) within the scope of he defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake.  <u>United States v. Duliga</u>, 204 F.3d 97 (3d Cir. 2000); U.S.S.G. § 1B1.3 application note 1.

       Jones argues that he and Morgan actually ran their own separate businesses and were not engaged in a jointly undertaken activity because they each kept separate client lists and did not share in the revenue from their sales.  The Court is not persuaded that separate client lists and separate revenue preclude liability for the entire enterprise.[17]

       To the contrary, Jones and Morgan jointly purchased and

---

[17] U.S.S.G. § 1B1.3(a)(1) application note 2(b)(2) states: "Defendant F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone.  Defendant F fraudulently obtains $20,000.  Defendant G fraudulently obtains $35,000.  Each is convicted of mail fraud.  Defendants F and G are accountable for the entire amount ($55,000)."

used the same equipment, jointly leased and operated out of the same, and numerous, residences, jointly set an agreed upon price for their products, jointly bore the costs to maintain the equipment, and occasionally shared credit card numbers. The Court finds that Jones and Morgan conducted their illicit business as a jointly undertaken activity. <u>United States v. Evans</u>, 155 F.3d 245, 254 (3d Cir. 1998).[18]


b.   <u>Aiding and abetting</u>

Whether Jones aided and abetted the undertakings of Mr. Morgan requires a far more basic analysis. Jones' decision to help pay for the rent, machinery and upkeep, regardless to what extent, and his decision to install the software necessary for Mr. Morgan to manufacture counterfeit access devices with the knowledge that Morgan was engaged in criminal activity, renders Jones liable for those crimes under § 1B1.3(a)(1)(A). <u>United States v. Maaraki</u>, 328 F.3d 73 (2d Cir. 2003) (holding that stealing calling card numbers and passing them on to associates aided and abetted the subsequent fraudulent use of those numbers and thus defendant was responsible for all loss).

---

[18] As for prongs (2) and (3), that the conduct is within the scope of he defendant's agreement that it was reasonably foreseeable, Morgan testified that the two men rented the property at 57th and Rodman Streets. for the sole purpose of running a counterfeiting operation. Hr'g Tr. 178:14 Nov. 29, 2007.

As such, Jones is liable for each access device found at the Alden Street and Girard Avenue locations.

* * *

Jones is liable for each of the 2,748 access device found at both residences, and thus, liable for the entire $1,374,000.  This amount yields a base offense score of 6 and a specific offense enhancement of 16[19] for the amount of loss.  The offense level for the defendant, therefore, absent any enhancements, would be 22.

B.   Sophisticated Means

The defendant objects to the two-point enhancement for sophisticated means, claiming that the manner in which the crime was committed did not rise to the level of warranting an enhancement.  U.S.S.G. § 2B1.1(9)(C) states, "If . . . the offense otherwise involved sophisticated means, increase by 2 levels."  Sophisticated means are defined by the guidelines as;

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

---

[19] An amount of loss between $1,000,000 and $2,500,000 yields a specific offense enhancement of 16.  U.S.S.G. § 2B1.1(b)(1).

U.S.S.G. § 2B1.1 application note 8(B).  Courts have interpreted this provision in a number of different settings.  For example, it has been applied to crimes committed overseas,[20] or involving numerous loan documents,[21] or to a conspiracy to file 15 false tax returns,[22] or involving a series of fraudulent financial representations.[23]

        The government cites to <u>United States v. Vaughn</u>, a case in which the Second Circuit found appropriate the application of the sophisticated means enhancement when the evidence showed, "a specialized identification card printer, a laptop computer loaded with software used to forge identification cards as well as images of state seals, and an electronic pad used to input digitized signatures onto false identification cards.  Defendant produced false drivers' licenses from multiple states bearing the names, birth dates and license numbers of victims along with photographs and physical descriptions of a co-conspirator."  159

---

        [20] <u>United States v. Sonowo</u>, 63 F. App'x 63 (3d Cir. Mar. 18, 2003) (non-precedential).

        [21] <u>United States v. Connors</u>, 2007 U.S. Dist. LEXIS 74904 (E.D. Pa. Oct. 9, 2007).

        [22] <u>United States v. Kopietz</u>, 126 F. App'x 708 (6th Cir. Mar. 29, 2005) (non-precedential).

        [23] <u>United States v. Bissell</u>, 954 F. Supp. 841, 888 (D.N.J. 1996) (applying the sophisticated means enhancement after the evidence showed the practices of skimming money, fraudulent write-offs, overstating business expenses, misstating ownership interest and withholding payroll taxes).

F. App'x 287, 288 (2d Cir. Dec. 15, 2005) (non-precedential).
The evidence presented in the instant case is all but identical
to that presented in <u>Vaughn</u>,[24] albeit on a much larger scale.[25]

The factors giving rise to an enhancement in this case
are: (1) the use of multiple computers, scanners, card printing
machines, skimmers, and an embossing machine; (2) the use of
specialized and/or highly technical software; (3) multiple
locations (at least five) operated by two parties; and (4) a vast
number of devices found (6700).  With the exception of the number
of account numbers found at the Alden St. and Girard Ave.
locations, the defendant admitted to all of these facts at his
change of plea hearing.

Further, the investigating Secret Service agent
testified that based on his training and experience, the Alden
St. and Girard Ave. plants were the most extensive and
technically advanced operations that he had ever seen.  Hr'g Tr.
97:15-19, Nov. 29, 2007.

Jones' reliance on the application note's reference to
"shell corporations" and "offshore financial accounts" as
representing an exhaustive list of those circumstances that would

---

[24] Defense counsel's contention that the absence of a device
to import digitized signatures at present distinguishes <u>Vaughn</u> is
not persuasive.  Hr'g Tr. 7:9, Mar. 25, 2008.

[25] Defense counsel contends that <u>Vaughn</u> was wrongly decided.
Hr'g Tr. 7:3, Mar. 25, 2008.

give rise to a sophisticated means enhancement is misplaced; this "list" is illustrative, not exhaustive.  In this case, the size and duration of the scheme perpetrated by the defendant and the means employed, complex hardware and specialized software requiring expertise, all speak to the sophistication of the offense.

For these reasons, the Court shall apply the two-point enhancement for sophisticated means

C.   Criminal History Score

Jones also argues that the PSR miscalculated his criminal history score under the guidelines insofar as it includes a 1987 sentence.  His contention is that he only spent one month in prison and the remainder of the sentence on work release.  U.S.S.G. § 4A1.1(a) states that a defendant shall receive three criminal history points for each prior sentence of imprisonment exceeding one year and one month.  A sentence of imprisonment that stipulates or permits alternate treatment is treated as a sentence of imprisonment.  United States v. Schnupp, 368 F.3d 331, 335 (3d Cir. 2004).  "A sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period."  U.S.S.G. § 4A1.1 application note 1.  However, in the case of an adult

-21-

term of imprisonment totaling more than one year and one month, the date of last release from incarceration on such a sentence is to be used in determining the applicable time period.  U.S.S.G. § 4A1.2(k)(2)(B).

Philadelphia Court of Common Pleas Judge Mark Bernstein sentenced Jones to "not less than 4 months, not more than 23 months in Philadelphia County Prison, with immediate work release."  Gov't. Ex. L.  On November 16, 1994, Jones violated his parole and was re-sentenced by Judge Bernstein to three to 23 months incarceration with authorization for work release, parole to be effective January 4, 1995.  Thus Jones' last date of release from prison, January 4, 1995, was within 15 years of the date of the commission of the current offense in 2003.

Jones' argument ignores the teaching of Schnupp.  Citing to a Sentencing Commission publication, Questions Most Frequently Asked About the Sentencing Guidelines, the Schnupp Court noted, "If the offender was sentenced to imprisonment and as part of the term of imprisonment was placed on work release status, this would be treated as a sentence of imprisonment." Schnupp, 368 F.3d at 335.  For these reasons, the Court will consider Jones' 1987 sentence in determining his criminal history score; his 17 criminal history points yield a criminal history score of VI.  U.S.S.G. § 5A.

D.   <u>Obstruction of Justice</u>

Jones next argues that he should not receive a two-point enhancement for obstruction of justice.  U.S.S.G. § 3C1.1 states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice with respect to the . . . sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

In short, U.S.S.G. § 3C1.1 applies only when a defendant has made efforts to obstruct the investigation, prosecution, or sentencing of "the offense of conviction."  <u>United States v. Powell</u>, 113 F.3d 464, 468 (3d Cir. 1997).  When used in a criminal statute, the term "willful" generally means an act done with a bad purpose, and not one simply done intentionally.  <u>United States. v. Belletiere</u>, 971 F.2d 961, 965 (3d Cir. 1992) (quoting <u>Screws v. United States</u>, 325 U.S. 91, 101 (1945)); <u>United States v. Altman</u>, 901 F.2d 1161, 1164 (2d Cir. 1990) (to act "wilfully," defendant must consciously act with purpose of obstructing justice).

Application note 4(h) to § 3C1.1 states that "providing materially false information to a Probation Officer in respect to a presentence or other investigation for the court" constitutes an obstruction of justice.  Materiality is defined as "evidence, fact, statement, or information that, if believed, would tend to

-23-

influence or affect the issue under determination." § 3C1.1 application note 6. It is not disputed that as a general matter, a defendant's failure to disclose financial resources to a Probation Officer will affect the officer's determination of the defendant's ability to pay a fine or restitution. United States v. Cusumano, 943 F.2d 305 (3d Cir. 1991); see also United States v. Robinette, 177 F. Supp. 2d 279 (D. Del. 2001) (financial information requested by probation was material); United States v. Abuhouran, 161 F.3d 206 (3d Cir. 1998) (affirming district court's imposition of a two-point enhancement for obstruction of justice when the defendant had misled the probation department with regard to his financial assets). The government contends that the defendant wilfully provided false information to the probation office in its calculation of the fine and restitution the defendant had the ability to pay.

On March 27, 2007, Jones, at the request of the Probation Office, completed a "Worksheet for the Presentence Report" ("Net Worth Statement"). Page one of the Net Worth Statement, under "instructions for completing Net Worth Short Form Statement," directs the defendant to prepare and file an affidavit describing the defendant's financial resources, "including a complete listing of all assets you own or control as of this date." On page two, the Net Worth Statement asked the defendant to identify all, "cash on hand, bank accounts,

-24-

securities, money owed to you by others, life insurance, safe
deposit boxes or storage facilities, motor vehicles, real estate,
mortgage loans owed to you, other assets, anticipated assets, and
business holdings."  The defendant responded by writing down that
he owned "3 properties" with a total value of approximately
$240,000.  Gov't Ex. N.  The government contends that this was a
material misrepresentation and that Jones, in fact, owned five
properties.[26]  The government contends that this answer
constituted a material misrepresentation because the defendant
failed to disclose his ownership interest in two properties
located at 5359 Grays Avenue and 3237 Berks Street.

### 1.   5359 Grays Avenue

Jones advances two arguments.  First, he argues that
with respect to the property located at 5359 Grays Avenue, he did
not identify it on the Net Worth Statement because the deed in
his name for the property had not yet been recorded at the time
he filled out the Net Worth Statement.  Hr'g Tr. Dec. 11, 2007
69:17-20 ("When I say I own the property . . . I had not . . .
recorded the deed so I did not legally, legally own it.").
Apparently, the Jones claims that because the deed had not yet
been recorded he did not "own" the property and, consequently, he

---

[26] Mr. Jones does not dispute the fact that he received the
deed for 5359 Grays Avenue and purchased it for $5,000 on
November 18, 2005.  Gov't Ex. G.

was not required to disclose it on the Net Worth Statement.

Second, Jones argues that even if he did not identify the property on the Net Worth Statement, he, in fact, informed both Pre-trial Services and the investigating Secret Service agents of his ownership interest.  In light of these arguments, the task before the Court, therefore, is to determine whether either the fact that the deed was not recorded or the fact that Jones had told other government agencies about his stake in the property demonstrates, if true, the absence of willful obstruction on the part of the defendant.[27]  Neither does so.

With regard to the first argument-that Jones did not own the 5359 Grays Avenue property because the deed had not yet been recorded-the argument is unavailing.  One, while the recording of a deed evidences ownership, it is not necessary for the same.  M'Keen v. Delancy's Lessee, 9 U.S. 22, 28 (1809) (Marshall, C. J.).  Thus as a legal matter, whether the defendant "owned" the 5359 Grays Street property does not turn on whether the deed to the property had been recorded.  Two, and most importantly, the Net Worth Statement not only asked for a listing of the assets which Jones "owned," but it also asked for a complete listing of all assets which the he "control[led]."

---

[27] The government bears the burden of persuasion on the issue of obstruction of justice.  United States v. Belletiere, 971 F.2d 961, 965 (3d Cir. 1992) (seeking to avoid having a defendant prove a negative to avoid a stiffer sentence).

Therefore, since the Jones does not contest that he did "control" the property (just that he did not "own" it), he was equally obligated to report it in the Net Worth Statement.

With regard to the second argument, that Jones disclosed ownership to Pre-Trial Services and the Secret Service agent, this argument is also unavailing and simply untrue.  Jones claims that his statement to Pre-trial Services in the Home Confinement Program Work Schedule, that he worked at a club called "G" or "G Spot" located at 5359 Grays Avenue, constituted disclosure of his real estate interest in the 5359 Grays Avenue property.  Def. Ex. 4.  The Court disagrees.  Working at a club is one thing; holding an interest in the real estate where the bar is located is something else altogether.  Further, when asked specifically to list his real estate interests, under the "Real Estate Description" and "Additional Asset Data" sections of the form submitted to Pre-trial Services, the defendant did not state that he owned the property at 5359 Grays Avenue.  Under these circumstances, the Court concludes Jones did not disclose his ownership interest in the 5359 Grays Avenue property to Pre-trial Services.  Id.

As for his alleged "disclosure" to Secret Service, Jones claims that when he signed a consent form to allow the search by the Secret Service on 5359 Grays Avenue, he was admitting to his ownership of the property.  Def.'s Ex. 2.

However, as a legal matter, consent to search may be given by any person with common authority over a particular property, not just the legal owner.  Therefore, under these circumstances, the Court is not persuaded that by consenting to the search, Jones was somehow signaling to the Secret Service agent that he was the owner of the property.  United States v. Clark, 96 F. App'x 816, 819 (3d Cir. Apr. 26, 2004) (non-precedential) (citing United States v. Matlock, 415 U.S. 164 (1974) (consent may be given by anyone who has authority over the premises)).  Thus, Jones did not disclose his ownership interest in the 5359 Grays Avenue property to the Secret Service.


                    2.   3237 Berks Street

          Jones contends that while he did purchase the 3237 Berks Street property on March 21, 2006, it was seized and condemned by the City of Philadelphia on July 12, 2006, well before he filled out the net worth statement.  This argument advances the theory that through the condemnation procedures, the City of Philadelphia divested the defendant of title and ownership of the property.

          Condemnation becomes effective as of the filing of the declaration of taking.  26 Pa. Cons. Stat. § 302; Will-Tex Plastic Mfg. v. Dept. of Hous. & Urban Redev. Auth. of Montgomery County, 356 F. Supp 654, 658 (E.D. Pa. 1972), aff'd, 478 F.2d

1399 (3d Cir. 1974).  Upon the filing of a notice of taking, title to the concerned property transfers from the owner to the governmental body seeking condemnation.  United States v. 92 Buena Vista Ave., 507 U.S. 111, 135 (1993).  Therefore, after the notice of condemnation was issued, Jones no longer "owned" or "controlled" the property at 3237 Berks Street.

The government argues, nevertheless, that when a governmental entity condemns a property, the legal owner, such as the defendant in this case, is entitled to receive just compensation and thus, in this case, Jones had either received or expected to receive an amount of $50,000.[28]  According to the government, the defendant was obligated either to report the $50,000 as "cash on hand" or if he had not yet received the monies, as "money owed to you" on his Net Worth Statement.  Gov't Ex. N.

The Court agrees, but the issue at present concerns the PSR's statement that Jones had failed to disclose certain properties which he owned to the Probation Office.  The government did not object to PSR's decision not to consider the defendant's failure to disclose "cash on hand" or "money owed to you" as a basis for the obstruction of justice enhancement.  Because the condemnation divested the defendant of any ownership interest he may have had in the 3237 Berks Street property, i.e.

_____

[28] The house had been appraised at $50,000.  See Gov't Ex. R.

-29-

he did not "own" or "control" the property, and because whatever monies he received or expected to receive as a result of the condemnation were not considered in the PSR, the Court will not apply the obstruction of justice enhancement on this basis.

* * *

The Court finds the two-point enhancement for obstruction of justice is merited in this case for the Jones' non-disclosure of the 5359 Grays Avenue property alone.

E.   Acceptance of Responsibility

Lastly, Jones objects to the Probation Office's decision not to award him a two-point reduction under U.S.S.G. § 3E1.1. This provision of the Guidelines allows for a reduction of a defendant's criminal history score in the event that the defendant "clearly demonstrates acceptance of responsibility for his offense." Id. Conduct warranting an enhancement for obstruction of justice under § 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." United States v. Thornhill, 80 F. App'x 187, 189 (3d Cir. Oct. 20, 2003) (non-precedential) (citing U.S.S.G § 3E1.1 application note 4).

It is undisputed that by pleading guilty early in the proceedings, Jones earned a two-point reduction for acceptance of

responsibility.  However, his post-guilty plea conduct of
providing materially false information to the Probation Office
with regard to at least one property that he owned, divests him
of this benefit.  See United States v. Batista, 483 F.3d 193 (3d
Cir. 2007) (holding that a defendant who pleads guilty and begins
to cooperate initially can still be prevented from claiming
acceptance of responsibility if he then demonstrates a
willingness to mislead government agencies).


IV.  CONCLUSION

        Jones' objection to the PSR's calculation of the amount
of loss will be sustained insofar as he will only be held liable
for 2748 access devices.  The remainder of defendant's objections
are overruled.[29]  The defendant's total offense level shall be 26
and his criminal history category, VI.

---

        [29] Although once contested, the government stated at the
March 25, 2008, hearing, that it was no longer pursuing the
number of victims enhancement under U.S.S.G. § 2B1.1(b)(2), thus
lowering his offense level by four points.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
                              :      NO. 06-367
     v.                       :
                              :
GREGORY JONES                 :
                              :

ORDER

_____**AND NOW**, this 29th day of May, 2008, after considering the defendant's objections, hearing, proposed findings of fact and conclusions of law, and sentencing memoranda, it is hereby **ORDERED** as follows:

1. The defendant's objection to PSR insofar as it miscalculated the amount of loss is **SUSTAINED in part** and **OVERRULED in part.**  The amount of the loss is calculated by multiplying the number of access devices for which the defendant is accountable, 2,748, by $500.  The resulting amount is $1,374,000.

2. The defendant's objection to the sophisticated means enhancement is **OVERRULED.**

3. The defendant's objection to the obstruction of justice enhancement is **OVERRULED.**

4. The defendant's objection to being denied a departure for acceptance of responsibility is **OVERRULED.**

5. The defendant's objection to the calculation of

his criminal history score is **OVERRULED.**


      **AND IT IS SO ORDERED**


                 **S/Eduardo C. Robreno**  
                 **EDUARDO C. ROBRENO, J.**